## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SECURITY INSURANCE COMPANY
OF HARTFORD,

       Third-Party Plaintiff,

vs.                                      No. CIV 04-1246 JB/ACT

CLOVIS INSURANCE CENTER, INC.,
d/b/a DESERT STATES INSURANCE,

       Third-Party Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Third Party Defendant's Motion for Summary Judgement and Supporting Memorandum, filed March 1, 2006 (Doc. 136). The Court held a hearing on this motion on April 14, 2006. The primary issues are: (i) whether there is a genuine issue of material fact that Security Insurance Company of Hartford ("SICH") is not entitled to indemnification from Clovis Insurance Center, Inc. ("Clovis"); and (ii) whether there is a genuine issue of material fact that Clovis owed a duty to Premium Financing Specialists, Inc. Because there is no independent, preexisting relationship between SICH and Clovis, the Court concludes that SICH does not have a right to indemnification. The Court also finds, however, that although Clovis may not owe a duty to SICH, Clovis owed a duty to PFS. Because SICH does not have a right to indemnification, and because Clovis owed a duty to PFS, the Court will grant the motion in part and will deny the motion in part.

**FACTUAL BACKGROUND**[1]

1.      **Individuals and Parties Involved in the Lawsuit.**

Premium Financing Specialists, Inc. ("PFS") initially filed this lawsuit in the United States District Court for the Western District of Missouri against SICH.  PFS sought to recover unearned premiums that it financed for Radiant Group, LLC and Bell Gas, Inc.  SICH was an insurance company in New Mexico, and at all times a wholly owned subsidiary of Royal & SunAlliance Companies.

PFS specializes in financing insurance premiums and was asked to finance premiums on insurance policies that Bell Gas and Radiant Group desired to obtain from SICH through Tesher Corporation, SICH's managing general agent.  Bell Gas is a closely held family business which operates in New Mexico, Arizona, and Texas, with its principal place of business in Roswell, New Mexico.

After being sued as a defendant in Missouri, SICH joined Clovis as a third-party defendant. Clovis is an insurance broker with its office in Clovis, New Mexico and an office operating in Albuquerque, New Mexico under the name Desert States Insurance.  Clovis employed Maggie Anderson, and she was the agent that was principally involved in the transaction that is at the center of this lawsuit.

Alternative Risk Transfer Strategies, Inc. ("Artis") was also a wholly owned subsidiary of the Royal & SunAlliance Companies.  Brian Thibodeau served as counsel or senior counsel for the Royal

---

[1] The parties have not provided all of the factual record.  Partially missing are the responses to many of the requests for admission.  The parties, however, do not dispute most of the facts.  The Court has cited to the parties' briefs and supporting citations for the disputed facts where necessary. The Court does not, however, have to decide and thus should not decide the disputed facts to decide this motion.

& SunAlliance Insurance Companies and for Artis at all relevant times.

Tesher Corporation was a Texas corporation engaged in the business of marketing and selling insurance products.  John Tesseyman was the president and principal of Tesher Corporation.

### 2.   Clovis' and Anderson's Connection With Bell Gas and SICH.

Bell Gas is a "petroleum marketer" and its business includes hauling gasoline, diesel, oil, and propane and operating convenience stores, which have petroleum sales associated with the convenience store operation.  Bell Gas has had difficulty obtaining general and automobile liability insurance because of the nature of its business.  Bell Gas has been Anderson's client since about 1988. Federated Insurance Company provided general liability and automobile insurance coverage to Bell Gas in 2001-2002.  Coverage was set to expire on March 31, 2002, and Clovis and Anderson began working to find replacement coverage for Bell Gas in January 2002.

Neither Clovis nor Anderson was an agent for SICH or any of its related companies, nor were they under any contract to serve as an agent for SICH or any of its related companies.  Clovis and Anderson were acting as an independent broker for Bell Gas.

### 3.   Anderson's Contact with Tesher Corporation and John Tesseyman.

SICH and Tesher Corporation entered into a Program Administrator Agreement under the terms of which Tesher Corporation was appointed to serve as SICH's general agent and administrator of the "Tesher Program."  The Tesher Program focused on marketing and selling pyrotechnic and petroleum general and automobile liability insurance throughout the United States, and was designed to provide liability insurance coverage, general and automobile, for insureds such as Bell Gas.  The agreement authorized Tesher Corporation to market and collect premiums for SICH insurance.

Anderson's first contact with Tesseyman was in 2000 or 2001 when she was representing Bell

Gas in its efforts to find coverage for the time period from March 31, 2001 to March 31, 2002. This contact occurred before SICH and Tesher Corporation entered into their Program Administrator Agreement, and at that time, Tesseyman was associated with a different company. Tesseyman gave Bell Gas a quote for insurance coverage, but subsequently withdrew the quote stating that his primary pyrotechnic carrier had been downgraded by A.M. Best and he had to devote his time to that problem.

### 4.     **Bell Gas' Application and Tesher Corporation Termination.**

As part of her January 2002 efforts to find insurance coverage for Bell Gas, Anderson started exploring the market, and contacted Tesseyman. After contacting Tesseyman, Anderson submitted Bell Gas' application for coverage to Tesher Corporation under the Tesher Program. Anderson supplemented the application on January 31, 2002 upon Tesseyman's request. Tesher Corporation submitted Bell Gas' application to SICH on March 15, 2002, and SICH through Artis, began underwriting the application. SICH/Artis gave written notice to Tesher Corporation on March 18, 2002, that it was terminating the Tesher Program immediately. Even though SICH/Artis gave written notice of termination to Tesher Corporation on March 18, 2002, SICH/Artis did not inform Bell Gas or Clovis of the Tesher Program's termination until April 24, 2002, when Thibodeau informed Anderson of such termination by telephone. When SICH/Artis sent the March 18 letter of termination to Tesher Corporation, SICH/Artis was aware that Bell Gas had submitted an application for general liability and automobile liability coverage through Tesher Corporation.

Clovis contends that SICH received Bell Gas' application from Tesher Corporation on March 15, 2002 and commenced underwriting, and that SICH did not advise Tesher Corporation, Bell Gas, Clovis, or Anderson that SICH was not issuing the insurance coverage sought in Bell Gas'

application.   See Third Party Defendant's Motion for Summary Judgment and Supporting Memorandum ("Motion for Summary Judgment") ¶ 26, at 9 (citing Clovis Request for Admission of Fact Nos. 28-30 and Thibodeau Depo. at 109-110).  SICH disputes this fact and asserts that it sent notices of cancellation to Bell Gas on April 16, 2002, and Thibodeau wrote a letter to Bell Gas on April 18, 2002 informing Bell Gas that no insurance had been issued, which SICH contends should have put Bell Gas on notice that there were serious issues with the coverage Bell Gas thought it was purchasing from SICH.  See Security Insurance Company of Hartford's Response in Opposition to Third Party Defendant's Motion for Summary Judgment ("Response in Opposition") at 4, filed March 27, 2006 (Doc. 140)(citing Clovis' Undisputed Material Facts Nos. 42-52).

     **5.**    **PFS' Financing of Premium and Payment to Tesher Corporation.**

Desert States contacted PFS on March 28, 2002 to seek financing for Bell Gas' insurance coverage.  PFS sent the proposed form of Finance Agreement to Desert States, and insisted that Bell Gas execute such.  Bell Gas, as the insured, was required to execute a PFS Finance Agreement, and Clovis also signed the agreement as to certain representations as the producing agent.  The PFS finance agreement specifically provides that Clovis, as the insurance broker, "is not the agent of PFS, except for any action taken on behalf of PFS with the authorization or consent of PFS, and PFS is not legally bound by anything the agent or broker represents to the insured, orally or in writing."  The only action that PFS authorized Clovis to take on its behalf was to issue a PFS draft to Tesher Corporation dated April 20, 2002 for $340,248.00.  The only written or oral instructions provided to Clovis regarding its authority to issue PFS's drafts was a one-page document entitled PFS Draft Procedures.  PFS did not authorize Clovis to stop payment of the April 20, 2002 PFS draft.

Clovis asserts that PFS conducted independently its own due diligence investigation, before

authorizing Clovis to issue the PFS draft on April 20, 2002, which investigation confirmed that Tesseyman and/or Tesher Corporation was a managing general agent of SICH, that Tesseyman and/or Tesher Corporation had authority to accept premiums, and that Tesseyman and/or Tesher Corporation had authority to bind and issue coverage. <u>See</u> Motion for Summary Judgment ¶ 34, at 11 (citing Clovis Request for Admission of Fact No. 62). SICH contends, however, that it has specifically denied that its representative told PFS that Tesseyman and/or Tesher Corporation were managing general agents, with authority to accept premiums and/or issue and bind coverage. <u>See</u> Response in Opposition at 6 (citing SICH's Response to Defendant's Request for Admission No. 34, and Thibodeau Depo. at 191). Clovis in turn argues that SICH has admitted on requests for admissions that PFS had "conducted independently its own due diligence confirming that Tesseyman and/or Tesher Corporation was a managing general agent of SICH, that Tesseyman and/or Tesher Corporation had authority to bind and issue coverage . . . ." Reply in Further Support at 4 (citing Clovis Request for Admission of Fact No. 62).

Clovis further contends that, as part of that due diligence, PFS had a phone conversation on April 1, 2002 with Sophia Elaine Kolb of SICH, who verified that Tesher Corporation was a managing general agent for SICH and that Tesher Corporation had authority to collect premiums and to issue policies. <u>See</u> <u>id.</u> (citing Clovis Request for Admission of Fact No. 36). SICH argues that Request for Admission of Fact No. 36 shows that SICH admits only that PFS <u>alleged</u> its due diligence in its complaint, but that SICH denied the substance of such allegation. <u>See</u> Response in Opposition at 6 (citing SICH's Response to Defendant's Request for Admission No. 34 and Thibodeau Depo. at 191). Clovis counters that, because SICH brings this action as an assignee of PFS, it stands in PFS' shoes, and that, under the doctrine of judicial admissions, SICH cannot now avoid the

allegations pled and relied upon by PFS.  See Reply in Further Support at 5 (citing Investment Co. of the Southwest v. Reese, 117 N.M. 655, 661, 875 P.2d 1086, 1092 (N.M., 1994), Salguero v. City of Clovis, 2003 U.S. Dist. LEXIS 25308 (D.N.M. 2003), and Schott Motorcycle Supply Inc. v. American Honda Motor Co., 976 F.2d 58, 61 (1st Cir. 1992)).

PFS agreed to finance 75% of the premium for the insurance coverage, which was being issued by SICH, and PFS authorized Clovis to issue a PFS draft made payable to Tesher Corporation in the amount of $340,248.00.  Clovis issued such draft by U.S. Mail on April 18, 2002.  At the same time, Clovis sent to Tesher Corporation its escrow draft for Bell Gas' 25% portion of the premium less commission in the amount of $68,058.60.

> ### 6.   Bell Gas' and Clovis' Notice of Cancellation and Thibodeau Letter.

On April 16, 2002, SICH sent to Bell Gas a "Notice of Cancellation, Nonrenewal or Change in Policy Limits/Form," informing Bell Gas that SICH's General Liability and Automobile insurance coverage would effectively cease on May 1, 2002 at 12:01 a.m.  The Notice of Cancellation did not contain a cover letter, nor was it accompanied by any explanation.  On April 18, 2002, Thibodeau sent to Bell Gas a letter on Artis' letterhead.  The letter did not advise Bell Gas that the Tesher Program had been terminated, nor did it advise Bell Gas that Tesseyman and/or Tesher Corporation had been terminated as SICH's agent.  The Thibodeau Letter stated the following:

> According to our records, no proposal, solicitation, invitation, quote or offer to bind coverage on any form of insurance was provided by or on behalf of the Royal & SunAlliance Insurance Companies.
>
> If our information is incorrect or if you are in possession of any information that contradicts our understanding, please contact me immediately at 1-888-558-1224.

The letter was a form letter sent to more than just Bell Gas.

Clovis first became aware of the "Notices of Cancellation, Nonrenewal or Change in Policy Limits/Form" on April 23, 2002, shortly before 2:44 p.m. (MT). Anderson received a phone call from Bertha Garcia at Bell Gas informing her that Bell Gas had received the documents, and Anderson in turn asked Garcia to send the documents to her by facsimile transmission. Shortly after the first April 23, 2002 telephone call from Garcia, Anderson received a second telephone call from Garcia informing her that Bell Gas had discovered the April 18, 2002 Thibodeau Letter from Artis, and Anderson requested that Garcia send her the letter by facsimile transmission.

At 2:44 p.m. that same day, Clovis received Bell Gas' facsimile of the SICH notice of cancellation and of the Thibodeau Letter. Anderson immediately called Thibodeau upon reading the letter. Thibodeau was not in his office, and so Anderson left a voice mail. After calling Thibodeau, Anderson sent Tesseyman a facsimile of the notices of cancellation, and the April 18 Thibodeau Letter and the question "what is this?"

Thibodeau returned Anderson's phone call the next day. Anderson was not available, and the receptionist took a message reflecting the call at 8:23 a.m. (MT). Later that same morning, April 24, 2002, Anderson returned Thibodeau's phone call at 8:39 a.m. In the subsequent conversation, Anderson outlined for Thibodeau her client's serious situation; if SICH was canceling the coverage for Bell Gas effective May 1, 2002, her client had only a few business days to find replacement coverage. Anderson asked that SICH not terminate coverage on May 1, 2002. At the end of the conversation, Thibodeau agreed to check and see if SICH would change its position.

The following day, April 25, 2002, Anderson tried to call Thibodeau at 10:05 a.m., because she had not heard back from him. She left a message asking him to call her back. Thibodeau returned Anderson's phone call later that same day at 12:32 p.m. (MT). Anderson was not available,

and Thibodeau left a message for her.

Anderson returned Thibodeau's phone call that afternoon at 1:21 p.m.  Thibodeau informed Anderson that SICH would not reconsider its decision to cancel coverage effective 12:01 a.m. May 1, 2002 and would not extend coverage in any way.  Anderson almost immediately sent an email to Tesseyman containing the following:  "I spoke with the attorney from Artis who sent the letter to Bell.  He has stated Royal is sticking with the cancellation effective 5-1-02.  [H]ave you heard anything yet?  [P]lease advise."  Tesseyman responded: "I just left a message for the attorney in regards to your letter.  My email is john@swpc.cc.  They will not talk re-instatement until my attorney and them resolve the collateral issue.  I will forward when I receive the letter.  There is Clarendon, remember."  Anderson answered the email: "Please make sure Clarendon can pick this up effective 5-1-02 if we need them to.  Thanks."  Tesseyman then reassured Anderson that "I have already notified them of the 'could be' orphans . . ."  Anderson believed at the end of the day April 25, 2002, that Tesseyman and Tesher Corporation were attempting to resolve their problem with SICH, and that if that was not possible, Tesseyman had made arrangements for coverage through Clarendon.

Clovis contends that upon receipt of the $340,248.00 draft, Tesher Corporation deposited it with its bank and on April 25, 2002, the PFS draft cleared PFS' bank.  See Motion for Summary Judgment ¶ 55, at 15 (citing Clovis Request for Admission of Fact Nos. 97-98).  SICH argues that PFS' Comptroller, Kevin Brown, testified that PFS could have stopped payment on the draft issued as late as the afternoon of April 26, 2002, and that the draft at issue did not clear the PFS account until April 26, 2002 in the afternoon.  See Response in Opposition at 6 (citing Brown Depo. at 78, 81).  Clovis in turn contends that: (i) SICH has already admitted this fact on requests for admission

of fact; (ii) SICH alleges in its Second Amended Third Party Complaint at paragraph 27 that the PFS draft cleared PFS' bank on April 25, 2002; and (iii) Brown's testimony does not establish this fact -- he admitted on cross-examination that he was not qualified to testify to the procedures followed by banks in settling and paying drafts, PFS had an agreement with Fleet Bank that governed the rights and obligations on the stopping of payment of instruments and such documents cannot be found, and he acknowledged that those agreements were the best evidence of those rights and obligations. See Reply in Further Support at 6 (citing Brown Depo. at 56-57, 60-61, 74, 77-81).

Clovis also contends, that before Thibodeau sent the April 18, 2002 letter to Bell Gas, SICH was aware that Tesseyman and Tesher Corporation were engaged in activities that included "binding coverage" after SICH had terminated the Tesher Program and in activities which Thibodeau and SICH believed constituted criminal activity. Motion for Summary Judgment ¶ 56, at 15. SICH disputes this characterization of the evidence and asserts that Thibodeau testified that any "awareness" by SICH of such activities on behalf of Tesseyman/Tesher was "rumor" and "speculation" based upon "anecdotal information" and that SICH had no direct proof of such information. Response in Opposition at 7 (citing Thibodeau Depo. at 124-25, 137). SICH argues that it was not exactly clear what the nature and extent of Tesseyman's improprieties were. Clovis in turn argues that Thibodeau explained he decided to send out the April 18, 2002 letter because it was becoming clear that Tesseyman was engaged in conduct which was "emerging as a criminal activity on his part in using [SICH's] name." Thibodeau also stated that SICH was aware that Tesseyman had collected premiums without authority and had engaged in double billing. See Reply in Further Support at 7 (citing Thibodeau Depo. at 133, 149-150).

Although SICH and Thibodeau had some reason to believe that Tesseyman and Tesher

Corporation were engaged in possible criminal activity, SICH and Thibodeau purposely did not state this in the letter and did not mention "Tesher Corp.'s" or "Tesseyman's" names, "because Thibodeau was not going to open up the company to libel, slander or anything else."  Thibodeau testified that the conscious decision was made to not reference Tesseyman and Tesher Corporation because "there was an ongoing dispute between [SICH] and Tesseyman and [his attorneys] about termination, whether, in fact, it was valid, what the date of that termination would be.  I certainly didn't want to invite any question of libel or slander or tortuous interference in business affairs by naming [Tesseyman] directly."

The April 18 letter did not advise Bell Gas that the Tesher Program had been terminated, that Tesher Corporation and Tesseyman had no authority to bind coverage, and that Tesher Corporation and Tesseyman had no authority to collect premiums.

Anderson advised Thibodeau on April 24, 2002 at 8:39 a.m. that Bell Gas had paid to Tesseyman a financed premium in excess of $400,000.00.  Thibodeau did not convey any concern to Anderson, nor did Thibodeau tell Anderson that SICH and Thibodeau were aware of possible criminal activity on the part of Tesseyman.  Thibodeau did not advise Anderson, either in the April 24 or April 25 telephone conversation, that the financed premiums paid to Tesseyman and Tesher Corporation were in any jeopardy or would not be properly accounted for by Tesseyman and Tesher Corporation under the terms and conditions of the Program Administrator Agreement.  Although Anderson had advised Thibodeau that Bell Gas had paid Tesseyman a financed premium of over $400,000.00, Thibodeau did not advise Anderson to take steps to cancel that payment or take any steps to protect Bell Gas or PFS regarding that payment.  Thibodeau instead advised Anderson that he could not give her legal advice and that she should act in the best interests of her client.  He also

told Anderson that the Tesher Program had been shut down and that SICH was updating its files.

## PROCEDURAL BACKGROUND

Clovis filed a motion to dismiss on March 18, 2005.  See Third-Party Defendant Clovis Insurance Center, Inc.'s Motion Pursuant to Fed. R. Civ. P. 10(c), 12(c) and 19(a) (Doc. 67).  As part of that motion, Clovis asked the Court to dismiss SICH's claim for indemnification.  The Court and the parties agreed, however, that the Court should delay ruling on the issue of indemnification until the summary judgment stage.  See Memorandum Opinion and Order at 21-22, filed May 10, 2006 (Doc. 155); Transcript of Hearing at 20:20-22, 32:11-14 (taken October 12, 2005).  Clovis now asks the Court, pursuant to rule 56 of the Federal Rules of Civil Procedure, to enter summary judgment.  See Motion for Summary Judgment at 1.

## STANDARD FOR DECIDING MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The opposing party may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(citing Fed. R. Civ. P. 56(e)).  An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party. See id. at 249-50 (citations omitted).  Mere assertions or conjecture as to factual disputes are not enough to survive summary judgment.  See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988).  The court may consider only admissible evidence when ruling on a motion for

-12-

summary judgment.  See World of Sleep, Inc. v. La-Z-Boy Chair, Co., 756 F.2d 1467, 1474 (10th Cir. 1985)(citing Fed. R. Civ. P. 56(e)).

## NEW MEXICO LAW REGARDING TRADITIONAL INDEMNIFICATION[2]

"Under traditional indemnification an indemnitee is entitled to be made whole by a third party such as the primary wrongdoer."  Amrep Southwest, Inc. v. Shollenbarger Wood Treating, Inc. (In re Consolidated Vista Hills Retaining Wall Litigation), 119 N.M. 542, 545, 893 P.2d 438, 441 (1995)(citing Rio Grande Gas Co. v. Stahmann Farms, Inc., 80 N.M. 432, 436, 457 P.2d 364, 368 (1969)).  "[T]raditional indemnification is a judicially created common-law right that grants to one who is held liable an all-or-nothing right of recovery from a third party . . . ."  Id.

### 1.      Independent, Preexisting Relationship.

The Supreme Court of New Mexico in Amrep Southwest, Inc. v. Shollenbarger Wood Treating, Inc. (In re Consolidated Vista Hills Retaining Wall Litigation), stated that "[t]raditional indemnification would appear to apply only when there is some independent, preexisting legal relationship between the indemnitee and indemnitor."  119 N.M. at 441-442, 893 P.2d at 545-546 (citing Peak Drilling Co. v. Halliburton Oil Well Cementing Co., 215 F.2d 368, 370 (10th Cir. 1954)). The Supreme Court noted in a footnote:

> Some courts and commentators have suggested that in exceptional circumstances indemnification should be allowed between concurrent tortfeasors who do not have an independent, preexisting legal relationship. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 51, at 343-44 (5th ed. 1984). These exceptional circumstances typically are defined as when there is a great difference in the degree of fault between concurrent tortfeasors or when the character of the duties owed by

---

[2] Clovis contends that only traditional indemnification applies.  See Motion for Summary Judgment at 22-23.  At the hearing, SICH conceded that traditional indemnification applied in this case and that proportional indemnification did not apply.  See Transcript of Hearing at 34:21-35:6 (taken April 14, 2006).

the tortfeasor to the plaintiffs is vastly different or disproportionate.  Id.

Id. at 442, 893 P.2d at 545-546 n.1.

The Supreme Court of New Mexico later affirmed, in Otero v. Jordan Restaurant Enters., 122

N.M. 187, 922 P.2d 569 (1996), that "[i]n cases which involve concurrent tortfeasors . . . the general

rule is that an action for traditional indemnification does not lie in favor of either tortfeasor in the

absence of some preexisting relationship between them that gives rise to an independent duty flowing

from the putative indemnitor to the putative indemnitee."  Id. at 189-190, 922 P.2d at 571-572

(citations omitted).   The Supreme Court, in Otero, declined to recognize the "exceptional

circumstances" exception to the independent, preexisting relationship rule noted previously in Amrep.

First, the Supreme Court recognized that, in Amrep, it did not have to decide whether the

"exceptional circumstances" exception applied under New Mexico law, because it had found, in

Amrep, that there was an independent preexisting relationship between the parties.  See id. at 189,

922 P.2d at 571.  The Supreme Court next recognized that the exceptions to the general rule came

about as "a byproduct of a system which prohibited contribution among jointly and severally liable

tortfeasors," that New Mexico had now adopted "the doctrine of several liability" "to establish an

equitable system in which in most cases a party is only liable to the extent that it was to blame for the

damages to the victim," and that, "[b]ased on these same equitable considerations [the Supreme Court

of New Mexico] adopted proportional indemnification as a means of equitably adjusting liability

between concurrent tortfeasors in those cases in which a defendant is denied the ability to raise the

fault of a concurrent tortfeasor as a defense because of the plaintiff's choice of remedy."  Id. at 190,

922 P.2d at 572 (citations and internal quotations omitted).  Finally, after finding that proportional

indemnification did not apply, the Supreme Court declined to recognize the "exceptional

-14-

circumstances" exception.  See id. at 191, 922 P.2d at 573 ("Further, because New Mexico tort law is premised on the notion that each concurrent tortfeasor should bear responsibility for an accident in accordance with his or her fault, we hold that in the absence of an independent, preexisting relationship the City would not be entitled to traditional indemnification if its negligence were a proximate cause of the plaintiff's damages, regardless of whether one might say that as compared to [other tortfeasors] its negligence was 'minimal.'").

The Supreme Court then recognized that, under some circumstances, a tortfeasor may be entitled to indemnification from another in the absence of an independent, preexisting relationship: "The successive-tortfeasor situation which will give rise to indemnification in favor of one tortfeasor against another without such a relationship . . . ."  Id.  It thus appears that in New Mexico, traditional indemnification is not applied when there is no independent, preexisting relationship between the indemnitor to the putative indemnitee where the indemnitor and the indemnitee are concurrent tortfeasors.

## 2.      **Active/Passive Conduct.**

"The purpose of traditional indemnification is to allow a party who has been held liable without active fault to seek recovery from one who was actively at fault."  Amrep Southwest, Inc. v. Shollenbarger Wood Treating, Inc. (In re Consolidated Vista Hills Retaining Wall Litigation), 119 N.M. at 546, 893 P.2d at 442.  The right to indemnification therefore "involves whether the conduct of the party seeking indemnification was passive and not active or in pari delicto with the indemnitor." Id. at 442, 893 P.2d at 546.  The Supreme Court in Amrep explained the early history of the active/passive test:

New Mexico first adopted the active/passive and in pari delicto tests in Krametbauer

-15-

v. McDonald, 44 N.M. 473, 104 P.2d 900 (1940). Krametbauer involved a situation
in which a child, crossing a highway after exiting a school bus, was struck and killed
by a speeding motorist.  The trial court found that the negligence of both the bus
driver and the motorist had contributed to the death of the child.  The bus driver
sought indemnification from the motorist claiming the former was only "passively
negligent" whereas the latter was "actively negligent and therefore primarily liable."
Id. at 480, 104 P.2d at 904. The Court held each was an active tortfeasor and
therefore in pari delicto and primarily liable.  Id. at 481, 104 P.2d at 905.  The Court
denied indemnification for that reason without consideration of whether active/passive
concurrent tortfeasors must nonetheless have some independent, preexisting legal
relationship to support indemnification. . . . [W]e do observe that no New Mexico
case actually has denied indemnification to a passive wrongdoer because of the
absence of an independent, preexisting legal relationship.

Id.  The Supreme Court explained that "[t]he doctrine of in pari delicto . . . has reference to nothing

more than the active fault of each wrongdoer or the passive fault of each."  Id. (citations omitted).

    The Supreme Court defined active and passive conduct:

Active conduct is found if an indemnitee has personally participated in an affirmative
act of negligence, was connected with negligent acts or omissions by knowledge or
acquiescence, or has failed to perform a precise duty which the indemnitee had agreed
to perform.  Passive conduct occurs when the party seeking indemnification fails to
discover and remedy a dangerous situation created by the negligence or wrongdoing
of another.  Passive conduct may also occur when a party is nothing more than the
retailer in the chain of distribution of a product.

Id. at 443 893 P.2d at 547 (citations and internal quotations omitted).  The Supreme Court further

explained:

There is a subtle distinction between the situation in which a party fails to discover
and remedy a dangerous condition and the situation in which a party discovers a
dangerous condition created by another but does nothing to remedy it.  In the first
instance, the conduct of the party not discovering the dangerous condition is passive.
That party is entitled to indemnification from the one creating the condition because
as between the two parties the courts have clearly seen the greater responsibility of
the one who created the dangerous situation.  In the second instance, the conduct of
the party who does nothing after discovering the dangerous condition is active. That
party is not entitled to traditional indemnification from the one creating the condition
because to do so would be to shift the whole burden of loss onto one tortfeasor from
another whose improper conduct is fully as odious.

-16-

Id. (citations and internal quotations omitted).

## LAW REGARDING AGENCY

1.        **Agency and Apparent Authority.**

"An agent is a person who, by agreement with another called the principal, represents the principal in dealings with third persons or transacts some other business, manages some affair or does some service for the principal . . . .  The agreement may be oral or written . . . ."  UJI 13-401 NMRA (2005).

"[A]ctual authority is determined in light of the principal's manifestations of consent to the agent . . . ."  Romero v. Mervyn's, 109 N.M. 249, 253, 784 P.2d 992, 996 (1989)(citation and internal quotations omitted).  A principal is liable for the acts committed "within the actual authority of an agent."  Id. (citation omitted).  "[A] principal . . . is responsible for the acts of the agent when the principal has clothed the agent with the appearance of authority.  Apparent authority arises from manifestations by the principal to the third party and can be created by appointing a person to a position that carries with it generally recognized duties."  Diversified Dev. & Inv. v. Heil, 119 N.M. 290, 296, 889 P.2d 1212, 1218 (1995)(citations and internal quotations omitted).  See Romero v. Mervyn's, 109 N.M. at 253, 784 P.2d at 996 ("While actual authority is determined in light of the principal's 'manifestations of consent' to the agent, apparent authority arises from the principal's manifestations to third parties . . . and can be created by appointing a person to a position that carries with it generally recognized duties.")(citation and internal quotations omitted).  A third person "has notice of the termination of authority when he knows, has reason to know, should know, or has been given a notification of the occurrence of an event from which, if reasonable, he would draw the inference that the principal does not consent to have the agent so act for him . . . ."  Bozza v. General

Adjustment Bureau, 103 N.M. 200, 203, 704 P.2d 454, 457 (Ct. App. 1985)(citation omitted). See Ham v. Ellis, 42 N.M. 241, 250, 76 P.2d 952, 958 (1937)(stating that apparent authority and its effect disappear "in the presence of the actual knowledge of the third party as to the real scope of the agent's authority, or when the former has knowledge of facts which would put him upon inquiry as to the actual warrant of the agent").

> ## 2.    **Agency and Fiduciary Duty**.

"A fiduciary relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of one reposing the confidence." Allsup's Convenience Stores, Inc. v. North River Ins. Co., 127 N.M. 1, 15, 976 P.2d 1, 15 (1998)(citing State ex rel. Udall v. Colonial Penn, 112 N.M. 0,123, 812 P.2d 777, 785 (1991). "There can be no doubt that a fiduciary relationship exists between an agent and his principal." Rice v. First Nat'l Bank, 50 N.M. 99, 103, 171 P.2d 318, 321 (1946).

"[A]n agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person." See Restatement 2d of Agency, § 381. The United States Court of Appeals for the Tenth Circuit has explained that "[t]he duties of a fiduciary are strictly defined. Courts have imposed on a fiduciary an affirmative duty of utmost good faith and full and fair disclosure of all material facts . . . ." Geman v. SEC, 334 F.3d 1183, 1189 (10th Cir. 2003).

## ANALYSIS

The Court will grant summary judgment in part and will deny it in part. Because New Mexico does not allow indemnification to a concurrent tortfeasor in the absence of an independent,

preexisting relationship, the Court will grant summary judgment in part and dismiss SICH's indemnification claim.  Because Clovis owed a duty to PFS, and because Clovis has not presented any case law indicating that an assignee who itself is estopped by apparent authority from bringing a claim, may not bring a claim in the shoes of an assignor who is not so estopped and who has an independent cause of action, the Court will deny summary judgment in part, and will not dismiss SICH's actions based on Clovis' fiduciary duty to PFS.[3]

I.    **THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT SICH IS NOT ENTITLED TO INDEMNIFICATION.**

SICH and Clovis have no independent, preexisting legal relationship.  Clovis' conduct appears to be passive.  The Court will therefore grant summary judgment in part and dismiss SICH's indemnification claim.

A.    **SICH IS NOT ENTITLED TO TRADITIONAL INDEMNIFICATION AS THERE IS NO INDEPENDENT, PREEXISTING LEGAL RELATIONSHIP.**

It appears to the Court that both parties are operating under the assumption that an independent, preexisting legal relationship does not exist between SICH and Clovis.  Because the parties operate under this assumption, the Court will also operate under this assumption.  SICH, rather than arguing that an independent preexisting relationship existed, instead argues that "no New Mexico case actually has denied indemnification to a passive wrongdoer because of the absence of an independent, preexisting legal relationship."  Response in Opposition at 14-15 (quoting Amrep, 119 N.M. at 546, 893 P.2d at 442).  SICH also quotes Amrep for the proposition that the right to

---

[3] It does not appear to the Court that Clovis is arguing that its actions fulfilled its fiduciary duty toward PFS.  Because Clovis does not make that argument, the Court will not address it.  The Court also will not decide what the scope of Clovis' duty to PFS was, nor whether Clovis breached its duty to PFS as Clovis did not address those issues in its motion for summary judgment nor did Clovis ask the Court for a ruling on those issues.

indemnification "may . . . arise without agreement, and by operation of law to prevent a result which is regarded as unjust or unsatisfactory."  Response in Opposition at 14 (quoting Amrep, 119 N.M. at 546, 893 P.2d at 442).  If Amrep were the last word on traditional indemnification in New Mexico, the Court might agree with SICH that the "lack [of] a pre-existing legal relationship is clearly not fatal to Security's claim for indemnification."  Response in Opposition at 15.  The Supreme Court of New Mexico, however, has since spoken on this issue in Otero, and specifically reiterated the general rule that the right to indemnification requires an independent, preexisting legal relationship, and rejected the exceptions to that general rule.  Thus, although Amrep appeared to have left open the possibility that traditional indemnification could stand without an independent, preexisting legal relationship between concurrent tortfeasors, Otero appears to have closed the door on that possibility.  In addition, SICH does not indicate how its right to indemnification arises by operation of law to prevent an unjust or unsatisfactory result.  SICH has not given any examples, cited to any facts in case law, nor indicated how its circumstances would entitle it to such a right.  And, for the reasons discussed in the Court's active/passive analysis, the Court does not believe that the result of not allowing traditional indemnification is unjust.  Because it appears to the Court that the parties are operating under the assumption that there is no independent, preexisting legal relationship and because New Mexico, as between concurrent tortfeasors, precludes indemnification in the absence of such preexisting relationship, SICH is not entitled to indemnification under New Mexico law.

**B.    SICH IS NOT ENTITLED TO TRADITIONAL INDEMNIFICATION BECAUSE SICH'S CONDUCT WAS ACTIVELY NEGLIGENT.**

Additionally, the Court finds that the active/passive rule precludes any right to indemnification.  SICH contends that Clovis' conduct in "failing to take appropriate steps to address

-20-

the issues with the insurance policy and premium payment, despite the fact that Ms. Anderson had the information necessary to remedy the situation prior to the conversion of the premium payment at issue, is clearly the type of active conduct that supports" SICH's indemnification claim.  Response in Opposition at 15.  SICH further contends that its "failure [] to discover the fraud being perpetrated by John Tesseyman, despite its best efforts, is, at most, the type of passive conduct contemplated by the Court in Amrep."

The Court disagrees, and believes that Clovis' conduct was passive.  The Supreme Court of New Mexico explained, in Amrep, that "the conduct of the party not discovering the dangerous condition is passive" and "the conduct of the party who does nothing after discovering the dangerous condition is active."  Clovis informed SICH on April 24, 2002 that it had paid an insurance premium to Tesseyman.  SICH had sent out the April 18, 2002 letter because Tesseyman's conduct was "emerging as a criminal activity on his part in using [SICH's] name."  SICH also had reason to believe that Tesseyman had collected premiums without authority and had engaged in double billing.  Although SICH informed Clovis that it had terminated the Tesher Program, SICH failed to inform Clovis that the person who had been its agent, Tesseyman, no longer had authority to accept premiums for Clovis, or that Tesseyman, its past agent, had previously double billed and had engaged in what appeared to be criminal activity.[4]

---

[4] The parties dispute the characterization of what SICH "knew."  Thibodeau testified:

I know there were discussions between myself and others about our frustrations in attempting to shutdown Tesseyman and the Tesher program.  That if, in fact he was, as we now were becoming more concerned about actually going out and binding coverage, how we were going to deal with issues of authority apparently applied in actually - - and how to rescind those authority issues, and how to best get to anyone that could be affected by what, at that point in time, was starting to emerge as a criminal activity on his part in using our name.

First, Clovis did not discover the danger of the situation until the funds had been converted. That Clovis knew that the Tesher Program had been terminated does not equate to active conduct. Even though there may be a genuine issue whether Clovis should have known, based on the termination of the Tesher Program, that Tesseyman was not authorized to collect premiums for SICH, and that Tesseyman may have been committing fraud, Clovis did not know that this fraud was occurring, and any negligence committed by Clovis appears to be a failure to discover a dangerous situation -- passive conduct -- and not a failure to remedy a dangerous situation after discovering such -- active conduct. SICH's conduct, on the other hand, appears to be more active than Clovis' conduct. SICH was aware of the dangerous situation, at least to the extent of knowing that Clovis had paid a premium to SICH's previous agent, who had collected unauthorized premiums in the past, had double billed, and appeared to be engaged in criminal activity.

Second, the Court does not see how SICH can describe Clovis' actions as active and its own actions as passive, where SICH had all of the information that Clovis had -- Clovis had paid a premium to Tesseyman and Tesher Corporation had been terminated -- and much more -- SICH had reason to believe that Tesseyman had collected premiums without authority, that he had double billed, and that he had engaged in what appeared to be criminal activity. SICH may have told Clovis that it had terminated the Tesher Program, but such information does not automatically lead to a belief that any funds paid to Tesseyman were in danger of conversion. The information conveyed to Clovis

---

Thibodeau Depo. at 132:25-133:9. Also, after being asked "[w]hat criminal activities did you have reason to believe were ongoing on April - - prior to - - that necessitated writing this letter April 18?," Thibodeau replied "[t]hat he had collected premiums on our behalf that he had not remitted to the company. There were indications to us that he had double billed, if you would." See id. at 148:20-150:1. Thibodeau also gave a concrete example of what particular activity he had reason to believe Tesseyman was engaged. See id. at 150:1-15.

did not indicate that Tesseyman had been dishonest or may have been engaged in criminal activity. Clovis did not have information that would automatically lead Clovis to believe that Tesseyman would convert the premium check.

If, however, Clovis' failure to act is active conduct, then SICH's failure to act, when it had more information than Clovis, is also active conduct. By the same token, if SICH's failure to act is passive, Clovis' failure to act must also be passive, as it had less knowledge of what was occurring than SICH.

Finally, SICH contends that Clovis knew that the Tesher Program had been terminated and that SICH would not change its position on its May 1, 2002 cancellation notice. SICH thus argues that Anderson knew of the serious condition in time to allow PFS to prevent Tesseyman from converting the premium, and asserts that a reasonable insurance professional with 34 years of experience in the industry should have known that Tesseyman no longer had authority to accept premiums or issue policies of insurance to Bell Gas on behalf of Security, and that at the least she should have informed PFS of the situation. SICH may be correct, but SICH is not entitled to traditional indemnification even if Clovis was negligent and could have prevented the conversion, because as the Court has already discussed, Clovis' conduct was passive as it had not actually discovered the dangerous situation.

## II.   ALTHOUGH CLOVIS MAY NOT HAVE OWED A DUTY TO SICH TO ACT, CLOVIS OWED A DUTY TO PFS IN RELATION TO THE PFS DRAFT.

Clovis owed a duty to PFS in relation to the PFS draft. Clovis concedes that the finance agreement with PFS provided "the insurance agent or broker soliciting the policies or through whom the policies were issued is not the agent of PFS, except for any action taken on behalf of PFS with

-23-

the authorization or consent of PFS . . . ."   Motion for Summary Judgment ¶ 29, at 10.  Clovis also concedes that "[t]he only action which PFS authorized Clovis to take on its behalf was to issue a PFS draft to Tesher Corporation dated April 20, 2002 in the amount of $340,248.00."  Id. ¶ 30, at 10. Clovis thus admits that it was authorized to act on behalf of PFS with regard to the PFS draft.  Clovis does not argue that it was not the agent of PFS with regard to the PFS draft, but rather, it appears to the Court that Clovis is arguing that it did not owe a duty to SICH, and that under apparent authority and estoppel, SICH is bound by the acts of its agent Tesseyman and/or Tesher Corporation.

As an agent to PFS, with regard to the PFS draft, Clovis owed a fiduciary duty to PFS, see Rice v. First Nat'l Bank, 50 N.M. at 103, 171 P.2d at 321 ("There can be no doubt that a fiduciary relationship exists between an agent and his principal"), of "utmost good faith and full and fair disclosure of all material facts . . . ," Geman v. SEC, 334 F.3d at 1189.  Clovis relies on Bozza v. Gen'l Adjustment Bureau, 103 N.M. 200, 202-03, 704 P.2d 454, 456-7 (Ct. App. 1985), and NMSA 46-1-2 for the proposition that SICH is estopped from denying the existence of its agency relationship with Tesseyman and/or Tesher Corporation.  The Court in Bozza v. Gen'l Adjustment Bureau stated:

> The doctrine of apparent authority is based upon an estoppel theory:
>
> [T]he principal will not be permitted to establish that the agent's authority was less than what was apparent from the course of dealing for when one of two innocent parties must suffer, the loss must fall upon the party who created the enabling circumstances.

103 N.M. at 203, 704 P.2d at 457.

In Bozza v. Gen'l Adjustment Bureau, the corporate plaintiff sued the insurance company defendants for improper delivery of insurance proceeds to the president of the corporate plaintiff. See id. at 201.  The trial court granted summary judgment in the defendants' favor on the grounds

-24-

of apparent authority.   The Court of Appeals, while acknowledging the doctrine of apparent authority, found that questions of fact existed whether the defendants had notice or knowledge of the limitations on the president's authority, or possessed information which required them to make further inquiry before delivering the drafts to the corporation's president.  Evidence was presented in <u>Bozza v. Gen'l Adjustment Bureau</u>, that the insurance agent had been told that the corporate officers were suspicious of the president and were worried that he would abscond with the insurance money.

Clovis may be correct that SICH is estopped from claiming that it has a right to recover from Clovis because Tesseyman had apparent authority to act on behalf of SICH, and SICH as the principal creating the enabling circumstances is precluded from saying that Clovis' payment to Tesseyman was not valid in relation to Clovis' duty to SICH.  SICH, however, asserts that it has not contended that Clovis owed it such a duty, <u>see</u> Transcript of Hearing at 32:25-33:25, and is not bringing this claim in its own shoes, but rather is bringing this claim on behalf of PFS.  As assignee, SICH stands in the shoes of PFS.  Those claims that PFS had a right to bring, SICH has a right to bring.

It is unclear to the Court whether Clovis is arguing that an assignee who would not be able to bring its own claim because of apparent authority is also precluded from bringing an independent claim of an assignor who is not so precluded from bringing the claim.  Indeed, Clovis does not mention PFS' role or the effect of PFS' claims anywhere in its argument concerning apparent authority.  But if Clovis is making such an argument, it cites to no authority, and the Court is aware of no case law, standing for that proposition.

When viewing PFS' claims based on Clovis' fiduciary duties surrounding the draft, the Court does not see how <u>Bozza</u> or apparent authority is applicable.  PFS is the principal, and Clovis is PFS' agent regarding the draft.  In that relationship, there does not appear to be estoppel based on apparent

authority, nor is there any contention that PFS created the enabling circumstances.

Although Clovis may be held harmless as against SICH under <u>Bozza</u>, the claims SICH brings in PFS' shoes are brought in a different context, and the Court does not see how apparent authority would apply in a claim brought by PFS against Clovis.  Thus, although SICH may be estopped by apparent authority from bringing its own claims against Clovis, SICH, standing in PFS' shoes is not so estopped from bringing those claims that PFS is entitled to bring.

**IT IS ORDERED** that third Party Defendant's Motion for Summary Judgement and Supporting Memorandum is granted in part and denied in part.  The Court will dismiss SICH's indemnification claim.  The Court will not dismiss those claims based on fiduciary duty that SICH brings as an assignee of PFS.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Paul R. Koller
Christopher M. Wolpert
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

 *Attorney for the Third-Party Plaintiff*

Briggs Cheney
Law Office Briggs F. Cheney
Albuquerque, New Mexico

 *Attorney for the Third-Party Defendant*